**In re Michael J. LEMKE, formerly doing business as Twin Peaks Construction, and Chelsey J. Lemke, Debtors.**

**Robert D. Copper, Plaintiff–Appellant,**

**v.**

**Michael J. Lemke and Chelsey J. Lemke, Defendants–Appellees.**

**BAP No. CO–09–019.**
**Bankruptcy No. 07–17249 HRT.**
**Adversary No. 07–01658 HRT.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Feb. 24, 2010.

Dennis Love, Fort Collins, CO (Ken McCartney, The Law Offices of Ken McCartney, P.C., Cheyenne, WY, on the brief), for Appellant.

Todd R. Wagner, Wagner Law Office, P.C., Centennial, CO, for Appellees.

Before CORNISH, Chief Judge, BOHANON, and NUGENT, Bankruptcy Judges.

## OPINION

BOHANON, Bankruptcy Judge.

Appellant Robert D. Copper ("Copper") appeals the bankruptcy court's judgment that the debt owed to him by the Debtors is dischargeable under 11 U.S.C. § 523(a)(2)(A).[1] Following a trial on the merits, the bankruptcy court held that Copper failed to meet his burden of proof as to each element of § 523(a)(2)(A) and concluded that the debt owed to him was dischargeable. In this appeal, Copper asserts that the bankruptcy court erred by: (1) dismissing the case against debtor Chelsey Lemke ("Mrs. Lemke"); (2) failing to find that debtor Michael Lemke ("Mr. Lemke" or "Lemke") made false representations with fraudulent intent; (3) failing to find that his reliance on Debtors' representations was justifiable; and (4) requiring him to prove damages in a sum certain. After oral argument and careful review of the record before us, we AFFIRM.[2]

## I. Appellate Jurisdiction and Standards of Review

This Court has jurisdiction over this appeal. The Appellant timely filed his notice of appeal from the bankruptcy court's final order.[3] The parties have consented to this Court's jurisdiction because they have not elected to have the appeal heard by the United States District Court for the District of Colorado.[4]

 We review the factual findings of the bankruptcy court for clear error and its legal findings *de novo*.[5] A bankruptcy court's findings regarding a requisite element of § 523(a)(2)(A) is a factual determination reviewed under the clearly erroneous standard.[6] A factual finding is "clearly erroneous" when "it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been

---

1. All future references to "Section" or "§" are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, unless otherwise noted.

2. This Court heard oral argument in this case on January 26, 2010.

3. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002(a).

4. 28 U.S.C. § 158(b)-(c); Fed. R. Bankr.P. 8001(e).

5. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir.1996).

6. *See In re Anastas*, 94 F.3d 1280, 1283 (9th Cir.1996) (The issue of whether a requisite element of § 523(a)(2)(A) is present is a factual determination reviewed for clear error.); *Lindau v. Nelson (In re Nelson)*, 357 B.R. 508, 512 (8th Cir. BAP 2006) (The determination of whether a requisite element of a claim under § 523(a)(2)(A) is present is a factual determination which is reviewed for clear error.); *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782 (10th Cir.2009) (reviewing bankruptcy court's findings on intent to deceive and justifiable reliance under clearly erroneous standard).

made." [7]

## II. Factual Background

Lemke was a contractor who owned and operated Twin Peaks Construction. Lemke approached Copper, a construction lender, about borrowing money to build the Lemkes' "dream home" in Estes Park, Colorado (the "Home"). Lemke presented Copper with an estimate of $375,000 to purchase the property and build the Home. Based on the estimate, Copper and his investor, Greg Peterson, agreed to fund the project. Lemke signed a note and deed of trust in the amount of $375,000.

With an initial draw request of $182,500, Lemke purchased the property and began construction on the Home. Every few weeks, Lemke submitted an email with a draw request: $40,400 on October 1, 2005; $52,000 on October 31, 2005; $82,500 on November 21, 2005; $72,508 on December 15, 2005; $196,700 on January 16, 2006; and $80,200 on February 8, 2006. The draws were for various construction-related expenses (i.e., lumber, siding, appliances, plumbing, garage door, etc.), but some appeared to be for personal expenses. The January 16 request for $196,700 included $122,000 for consolidation of Lemke's brother's debts, an RV, a motorcycle, a truck, and a snow plow truck. Peterson testified he did not want to lend funds for debt consolidation or vehicles, so he only approved $75,000 of the draw request.

By the end of February 2006, Lemke's draws totaled $706,858, almost double the original estimate and note. Lemke signed a new note and deed of trust for $715,000. Mrs. Lemke also signed the new note and deed of trust. Copper and Peterson then asked Lemke to prepare a final draw request for completion of the Home. On March 8, 2006, Lemke submitted a final request for $76,400. Thereafter, Copper and Peterson did not lend further funds to Lemke. On April 5, 2006, Peterson sent Lemke a Notice of Default and Acceleration.

In May 2006, Copper visited the Home for the first time. He testified that the Home had no cabinets, counter tops, carpet, tile, or appliances. He further testified that he observed signs of vandalism. The Home's hot water tank had been cut away, the well pressure tank had been removed, and a Jacuzzi tub had been sawed out of its frame and placed in a bedroom. Copper took no steps to secure the Home at this time.

Throughout June and July, Peterson continued to email Lemke demanding payment on the loan. Lemke proposed to conduct a closing and repay the loan on August 11, 2006, but the closing did not occur and the loan remained unpaid. Lemke testified that the closing with Copper/Peterson did not occur because disputes had arisen between him and Peterson.

On September 12, 2006, Copper changed the locks on the Home. Copper testified that the conditions were generally the same as when he visited the Home in May. Leo Salazar, Copper's business manager, testified that there was no carpet in the Home and none stored in the basement and that he did not recall seeing tiles, cabinets, or counter tops in the Home or stored in the garage.

On September 22, 2006, Copper filed an action against the Lemkes in Larimer County, Colorado District Court, seeking

---

7. *Las Vegas Ice & Cold Storage Co. v. Far W. Bank,* 893 F.2d 1182, 1185 (10th Cir.1990) (internal quotation marks omitted).

to recover the balance due on the note and to foreclose on the Home. On June 26, 2007, the District Court entered an Order for Entry of Judgment and Order for Decree of Foreclosure, finding the Lemkes owed Copper $783,538.94 in principal, interest, and late charges, with interest accruing at a daily rate of $523.27 for a total of $909,495.72 as of the date of the Order ("State Court Judgment").

The Lemkes filed their Chapter 7 petition on July 6, 2007. Peterson purchased the Home from the Lemkes' bankruptcy trustee and sold the property. Copper filed a § 523(a)(2)(A) complaint against the Lemkes on October 20, 2007, seeking a declaration that the State Court Judgment is nondischargeable.[8] Copper claimed that the Lemkes engaged in fraud because they did not spend the loaned funds as represented in their draw requests.

On January 5, 2009, the bankruptcy court held a trial on Copper's nondischargeability claim.[9] At the close of Copper's case, the Lemkes moved for "summary judgment" on the claims asserted against them.[10] The bankruptcy court took that motion under advisement and allowed the debtors to present their case in chief. On April 29, 2009, the bankruptcy court issued a written decision in which he dismissed Copper's claim against Mrs. Lemke, but denied the motion to dismiss the claims against Mr. Lemke. Instead, the bankruptcy court considered those claims on the merits and entered judgment against Copper on the nondischargeability claim.[11] This appeal followed.

## III. Discussion

 Section 523(a)(2)(A) provides that the debtor is not discharged from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud.[12] To sustain a claim under § 523(a)(2)(A), the creditor must prove by a preponderance of the evidence that the debtor made a false representation with the intent to deceive the creditor, that the creditor reasonably relied on the misrepresentation, and the

8. *Complaint to Determine Dischargeability of a Debt Under 11 U.S.C. § 523(a)(2)(A)* at 5, *in* Appellant's Appendix ("App.") at 23. Copper also sought judgment in the amount of the State Court Judgment. *Id.* In his brief, Copper claims he did not ask for a money judgment because he already has one. *Appellant's Brief* at 16. In any event, the bankruptcy court did not enter a money judgment for Copper. Had it done so, at least one member of this panel would have remanded with instructions for the bankruptcy court to modify its judgment. *See Lang v. Lang (In re Lang),* 293 B.R. 501, 520–23 (10th Cir. BAP 2003) (Bohanon, J., concurring in the majority's decision to affirm the trial court's declaratory judgment that the debtor's debt to creditor is excepted from her discharge, but dissenting from the part of the decision affirming the trial court's award of a money judgment on the excepted debt.). *See also Porter Capital Corp. v. Hamilton (In re Hamilton),* 282 B.R. 22 (Bankr.W.D.Okla.2002) (Bohanon, J.) (bankruptcy courts lack subject matter juris-

diction to enter money judgments on excepted debts).

9. Copper, Peterson, Salazar, and Mr. and Mrs. Lemke testified. Lemke's initial proposal, a summary of the eight draws, the Lemkes' bank statements, emails between the parties, the warranty deed on 557 Grand Estes, the state court's sanction order and judgment, and the receipt for a lock were admitted into evidence. Photographs of the Home were not admitted, thus this Court will disregard them.

10. In its written order, the bankruptcy court properly characterized this motion as a motion to dismiss. Motions like this are authorized by Federal Rule of Civil Procedure 52(c), made applicable in bankruptcy by Bankruptcy Rule 7052.

11. *Findings of Fact and Conclusion of Law* ("*Appealed Order*") in App. at 37–45.

12. 11 U.S.C. § 523(a)(2)(A).

misrepresentation caused the creditor to sustain a loss.[13] Intent to deceive may be inferred from the totality of the circumstances.[14]

On appeal, Copper contends the bankruptcy court erred in dismissing the non-dischargeability claim against Mrs. Lemke because she undoubtedly knew the particulars of the construction of her "dream home." Copper also objects to the bankruptcy court's conclusions that Lemke's draw requests were not false representations nor made with the intent to deceive Copper, and that his reliance upon Lemke's draw requests was not justifiable. Finally, he argues that the bankruptcy court erred in requiring him to prove the amount of his damages.

A. *The bankruptcy court's dismissal of the § 523(a)(2)(A) claim against Mrs. Lemke was not clearly erroneous.*

■■ We review the dismissal of Copper's claim against Mrs. Lemke for clear error.[15] The bankruptcy court granted Mrs. Lemke's motion to dismiss because there was no proof that she committed any act in violation of § 523(a)(2)(A). The bankruptcy court found that Mrs. Lemke made no representations to Copper or Peterson at any time. The record supports the bankruptcy court's findings regarding Mrs. Lemke. Neither Copper nor Peterson testified that Mrs. Lemke made any representations to either of them, at any time. Mr. Lemke made all the draw requests. Mrs. Lemke's only involvement appears to be the signing of the second promissory note and deed.

Copper argues on appeal that Mrs. Lemke must have known that items on the draw requests were not purchased because appliances, carpets, cabinets, and counter tops for a homemaker's dream home are the type of items that a woman would select, purchase, and track (*i.e.*, know its location). Copper claims Mrs. Lemke's ignorance regarding the unaccounted for appliances, carpet, cabinets and countertops for her dream home cannot be believed. In addition, her testimony regarding the whereabouts of receipts was inconsistent. Copper claims that had Mrs. Lemke mentioned that she had not seen her new appliances, cabinets, countertops, or tile, lending would have ceased. Even if true, none of these arguments challenge the bankruptcy court's finding regarding whether Mrs. Lemke made any false representations to Copper or Peterson. Copper failed to present evidence on a crucial element of his claim. We conclude that the bankruptcy court's dismissal of Copper's claim against Mrs. Lemke was not clearly erroneous.

B. *The bankruptcy court's findings as to Mr. Lemke on false representations, intent, and reliance were not clearly erroneous.*

■ We likewise review the bankruptcy court's factual findings concerning Copper's claims against Mr. Lemke for clear error. The bankruptcy court concluded that Copper did not meet his burden of proof as to false representations, intent to deceive, and justifiable reliance. Copper

---

**13.** *Fowler Brothers v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996).

**14.** *Id.* at 1375.

**15.** *See* Fed.R.Civ.P. 52(c) advisory committee's note to 1991 Amendment ("A judgment on partial findings is made after the court has heard all the evidence bearing on the crucial issue of fact, and the finding is reversible only if the appellate court finds it to be 'clearly erroneous.' "). *See also Eberhardt v. Comerica Bank,* 171 B.R. 239, 242 (E.D.Mich.1994) (a Rule 52(c) dismissal operates as an adjudication upon the merits subject to the clearly erroneous standard of review).

attempts to overcome this failure of proof by arguing that the burden of proof should have shifted to the debtors.[16] Copper, however, did not argue that he was entitled to this shift in the burden of proof while before the bankruptcy court.[17] Copper's failure to press this argument before the bankruptcy court has foreclosed his right to present it on appeal.[18] Because the burden-shifting argument was not preserved for appeal, we limit our review to the bankruptcy court's factual findings.

■ Copper argued that Lemke's draw requests were false representations because Lemke did not spend the funds received as represented in the draw requests. Copper claimed that Lemke diverted a substantial amount of construction funds for his personal use, and that Lemke did not purchase some of the requested items (i.e., appliances, carpet, cabinets) because they were not present in the Home when he gained possession. The bankruptcy court found that the evidence before it was insufficient to support such a conclusion, noting that "Copper presented no evidence as to the disposition of funds that were not deposited into [the Lemkes' business] account," nor did he present copies of deposits slips or checks from Lemke's bank despite having Lemke's authorization for their release. The bankruptcy court concluded that:

> With no evidence as to the recipients of those funds, the Court cannot conclude

that those funds were diverted to Lemke's personal use. It is at least as likely that the funds were spent on materials and labor for the construction of the Home, especially here, where substantial construction progress was made on the Home.[19]

With respect to Copper's assertion that Lemke did not purchase some of the requested items (i.e., appliances, carpet, cabinets), the bankruptcy court found there was insufficient evidence to show that they were never purchased because Lemke affirmatively testified that he purchased them and Copper's own testimony regarding signs of vandalism gave a reasonable alternative explanation for their absence.

With respect to intent to deceive, Copper argued that the totality of circumstances, especially Lemke's accelerated "borrowing and not buying," proves intent to deceive. The bankruptcy court disagreed, stating that:

> The amount of work [ ] completed, along with [Lemke's] willingness to execute a new note for the additional funds advanced, points to a conclusion that he intended to complete the Home and replace Copper/Peterson's financing with permanent financing. That Lemke was unable to complete the Home within the cost estimate and time frame expected may show that he is a poor construction estimator or project manager, but it does not show that he never had the

16. Copper's burden-shifting argument is unclear. In his statement of the case, he argued that once a creditor establishes all elements of § 523(a)(2)(C), the burden shifts to the debtor to disprove an element required by § 523(a)(2)(A). *Appellant's Brief* at 6. Later in his brief, Copper argued that the burden of proof should have shifted to the debtors when he produced clear and convincing evidence of over $200,000 in misappropriated funds. *Id.* at 17.

17. Copper also never asserted a claim under § 523(a)(2)(C).

18. *Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir.1992) (appellate court will not consider issues that were not raised below).

19. *Appealed Order* at 6, *in* App. at 42.

intention to complete the Home or repay Copper/Peterson.[20]

With respect to justifiable reliance, the bankruptcy court concluded that Copper and Peterson's reliance on Lemke's draw requests was not justifiable because: (1) they did no investigation into Lemke's construction ability or financial worth before deciding to make the loan to Lemke despite having no prior relationship with him; (2) they accepted the draw requests which contained little to no detail as to the proposed suppliers and no breakdown for amounts to be spent on materials, supplies, or labor; (3) they continued to lend funds without requiring detail or documentation even after "red flags" appeared, such as when Lemke requested funds for loan consolidation and vehicles, or when Lemke's fund requests exceeded the amount of his original estimate; and (4) they did not visit the Home to observe construction progress until after Lemke defaulted on the loan, despite the fact that Copper lived nearby.

Copper argues on appeal that the bankruptcy court overlooked the difference in Lemke's testimony at trial and in his deposition. He argues Lemke's lack of answers and receipts prove he made false representations with intent to deceive. Finally, Copper argues his reliance was justifiable because he required an appraisal when the second note was signed.[21]

■ We are not convinced that the bankruptcy court overlooked any testimony. The bankruptcy court weighed the evidence and found Lemke's testimony regarding the purchase of materials credible.

When a bankruptcy court makes findings of fact based on the credibility of a witness, a reviewing court must pay great deference to the trial court's findings.[22] After reviewing the record, we conclude that the bankruptcy court's findings of no misrepresentation and lack of intent are supported by the record and are not clearly erroneous. The fact that many of the items are missing from the Home does not prove that Lemke did not purchase them. Indeed, given Copper's observation of vandalism, a just as likely explanation is that they were stolen. The fact that Lemke made substantial progress toward completion of the Home, along with his willingness to execute a new note, supports finding no misrepresentation or lack of intent.

■ The bankruptcy court's conclusion that Copper's reliance on the draw requests was not justifiable is also supported by many items in the record, including the fact that neither Copper nor Peterson had prior knowledge of the debtors, Copper's failure to do a credit check or require that receipts or estimates be supplied to support the draw requests, and Copper and Peterson's continued lending after various red flags arose. The fact that Copper and Peterson required an appraisal when the second note was signed is of little help to them because all but one of the draw requests pre-date the appraisal.

In sum, we cannot say with definite and firm conviction that the bankruptcy court erred. Indeed, the bankruptcy court's findings regarding false representations,

20. *Id.* at 7, *in* App. at 43.

21. In his brief, Copper also claimed he has known both Mr. and Mrs. Lemke's parents for years. *Appellant's Brief* at 16. This Court will disregard this assertion because there is no evidence of this in the record. The appraisal itself is also not a part of the record, but Copper did testify about relying upon an

appraisal. *January 5, 2009, Trial Transcript at 59, in* App. at 147.

22. *Dalton v. Internal Revenue Service,* 77 F.3d 1297, 1302 (10th Cir.1996) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

intent, and justifiable reliance are amply supported by the evidence.

### C. The bankruptcy court's damages conclusions were not clearly erroneous.

The bankruptcy court held that Copper had the burden of proving the amount of his damages and failed to meet that burden. The bankruptcy court noted that Copper and Peterson bought the home from the Lemke's bankruptcy trustee and thereafter sold it, but never introduced evidence as to what they paid for the Home or for how much they sold it. Instead, Copper testified that the Home was sold "for a few dollars over the appraised amount," about $600,000, leaving a deficiency from the State Court Judgment of about $300,000. The bankruptcy court stated that "[it] cannot enter a nondischargeable judgment of 'about $300,000.' "[23]

Copper argues the bankruptcy court erred by requiring him to prove the amount of his damages in a sum certain. But the amount of damages is irrelevant when the creditor has failed to meet his burden as to misrepresentation, intent, and reliance. Even if Copper had proven the exact amount of his damages, he failed to demonstrate Lemke's fraud.

## IV. Conclusion

For the above reasons, there is no reversible error in the bankruptcy court's findings or conclusions. Accordingly, we AFFIRM.

CORNISH, Chief Judge, and NUGENT, Bankruptcy Judge, specially concurring.

We both agree that the trial court's decision should be affirmed. We write separately to acknowledge Judge Bohanon's 15 years of outstanding service as a judge of this court. He was also a founding member of the BAP. All of the judges who have participated in a panel with Judge Bohanon always considered it the highest privilege to be in his company. This is Judge Bohanon's final participation and we wish him well in his retirement.

---

**23.** This statement is debatable. *See John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1052 (10th Cir.1990) (dischargeability is an all or nothing proposition; if a creditor can prove by clear and convincing evidence that the debtor obtained credit through fraud, the court should declare the debt nondischargeable in an amount it can reasonably estimate was obtained by the fraud). This Court, however, need not decide this issue to resolve this appeal.